[No. 13005. Department One. July 21, 1916.]

IULF IULFS CONRADS, *Appellant*, v. RALPH W. GREEN *et al.*,
*Respondents.*[1]

REFORMATION OF INSTRUMENTS—FRAUD—EVIDENCE — SUFFICIENCY.
Reformation of a mortgage can only be granted on clear and con-
vincing evidence, and the showing is insufficient where it appears
that plaintiff concealed the fact that he could not read the contract,
he had good business ability, and his attorney read and fully ex-
plained the papers, which he finally accepted against the advice of
his attorney.

NEW TRIAL—NEWLY DISCOVERED EVIDENCE. A new trial will not
be granted for newly discovered evidence which would not affect the
result.

MORTGAGES — FORECLOSURE — DEFICIENCY JUDGMENT — ATTORNEY'S
FEES. Where a mortgage limited the amount of a deficiency judg-
ment to $3,000, it was not error to refuse to enter a personal recovery
for the attorney's fees provided for in the notes and mortgage.

Appeal by plaintiff from a judgment of the superior court
for Yakima county, Preble, J., entered February 16, 1915,
denying the reformation of a mortgage, upon decreeing a
foreclosure, after a trial to the court. Affirmed.

*Butcher & Butcher*, for appellant.

*Roney & Loveless*, for respondents.

FULLERTON, J.—This action was brought to reform two
notes and a mortgage given to secure the same. There was
also a prayer for a judgment of foreclosure of the mortgage.
The lower court decreed a foreclosure, but denied the refor-
mation. From this judgment, plaintiff appeals.

In order that the questions presented may be fully under-
stood, a somewhat lengthy statement of the facts is neces-
sary. Appellant was a native born German, having lived in
that country for thirty-five years before coming to the United
States in 1891. He came to this state about the year 1904,
and located on one hundred and sixty acres of land, situated

[1]Reported in 159 Pac. 102.

some ten miles from Bellingham, which he improved and stocked. In the early part of 1913, the appellant, desiring to sell his farm, listed the same with Shaver, Maskell & McCue, a real estate firm doing business in Bellingham. In May of that year, Shaver took appellant to Eagle Harbor on a possible deal, and on the way called on respondent R. W. Green, at Seattle, to discuss with him the Eagle Harbor proposition. This deal was rejected by the appellant, and on the return to Seattle another call was made on the respondent, at which time the respondent stated that possibly he might be able to handle the appellant's property. The appellant had known the respondent previous to these visits.

On or about June 26, 1913, the respondent went to Bellingham at the request of Shaver. While there, he met the appellant, went out and examined the farm, and after some little negotiation, entered into a tentative agreement for its purchase. At the request of the appellant, the parties went to the offices of Hans Bugge, an attorney of Bellingham, to execute the necessary papers. An escrow agreement was drawn up and executed, whereby the respondent agreed to purchase the farm for $23,300; $5,000 to be paid in cash, $2,800 in some Seattle lots, and $15,500 by an assignment of a second mortgage on thirty acres of land situated in Yakima county. The respondent informed the appellant that there was a first mortgage of $4,500 on the Yakima land, but that the land was ample security for both mortgages.

At the time of making the escrow agreement, the respondent had practically closed a deal for the sale of his Yakima land by the terms of which he was to accept an initial cash payment and take back a mortgage on the land for $15,500. It was this mortgage respondent intended to assign to appellant in accordance with the escrow agreement. This sale, however, was not consummated, and the respondent, on or about July 2, 1913, appeared with his wife before appellant's attorney Bugge as a notary, and executed a mortgage for $15,500 on the Yakima land, and proposed this mortgage in

lieu of the mortgage agreed to be assigned. At a meeting of the parties held shortly thereafter, the appellant rejected the mortgage for the reason that it contained a provision expressly relieving the mortgagors from any personal liability thereunder. At this meeting, Bugge fully explained to the appellant the meaning of a deficiency judgment and a deficiency clause, advising him of the effect of an acceptance of a mortgage which repudiated personal liability.

Shortly after the rejection of this mortgage, the appellant, desiring to ascertain for himself the actual value of the Yakima land, went to North Yakima and convinced himself by investigation that the land was not worth more than $15,000. Bugge, also, in order to get information for his client, wrote several letters to persons in North Yakima making inquiries concerning the land, and having received replies thereto during the appellant's absence, read them to him upon his return. The values stated in these letters agreed substantially with the value found by the appellant in his personal investigation; one of them placing the value as low as $10,000.

On or about July 16, another meeting was had between the parties. At this time the appellant demanded $5,000 personal liability in a deficiency judgment clause, while the respondent first refused to become personally liable for any portion of the debt. After considerable discussion, it was finally agreed that the respondent should become personally liable through a deficiency judgment clause limited to the sum of $3,000. There was some misunderstanding as to just how this personal liability was to be incurred; the appellant seemed to have thought that the deficiency judgment was to be entered up to $3,000 in the event the land did not sell for enough to satisfy both mortgages, while the respondent's idea was that the mortgagors were to be personally liable only in the event the property did not sell for the amount of the first mortgage and $3,000 additional. Shortly after this meeting, Bugge prepared a mortgage according to his cli-

ent's understanding of the agreement, and sent the same to respondents, at Seattle, for execution. This mortgage the respondent refused to execute, and shortly thereafter went to Bellingham with two notes and a mortgage which were drawn in accordance with his own idea of the agreement. A meeting was had on July 21 at which the real estate brokers, the appellant, Bugge, and the respondent were present, when the respondent proposed his notes and mortgage. These were read and explained to the appellant by his attorney, who advised him not to accept them; saying that it was detrimental to his interests to do so, and that the mortgage was contrary to his (the attorney's) understanding of the agreement previously made concerning the $3,000 personal liability. The appellant accepting this advice, rejected the notes and mortgage as prepared by the respondent. The respondent thereupon returned to Seattle.

The final meeting was had in Bugge's office on July 26, 1913; the respondent being summoned to Bellingham by one of the real estate brokers. Besides the appellant, the respondent, and Bugge, there were present the three real estate brokers. Again the provisions of the notes and mortgage proposed by the respondent at the former meeting were read and explained to the appellant by Bugge, and he was again advised by him to reject them. Upon the respondent's refusal to make any further concessions, the appellant rejected the notes and mortgage as proposed. The testimony shows that, after making this rejection, the appellant left the office. He returned, however, in about ten minutes, and without any further discussion accepted the notes and mortgage with the $3,000 personal liability as proposed by the respondent.

The evidence further shows that, during the negotiations between the appellant and the respondent, the real estate firm of Shaver, Maskell & McCue had become agents for the sale of certain lands in California, and that they had sought

to interest the appellant in this land, offering him the opportunity of trading in the respondent's mortgage on the purchase price in lieu of cash. Subsequent to the consummation of the transaction here involved, the appellant purchased on contract one hundred and forty acres of the California land through Shaver, Maskell & McCue, turning in as part payment therefor the respondent's notes and mortgage at their full face value. The appellant, however, failed to meet the interest on subsequent payments due under his contract for the land, and the contract was cancelled and the notes and mortgage returned to him. This action was thereafter brought.

The principal question involved is the appellant's right to reformation upon the ground of fraud. In determining this question, it should be carefully distinguished from the other questions not directly involved, but merely suggested by the facts. The question here is not whether the appellant was fraudulently induced to enter into any certain contract, but whether the notes and mortgage he accepted actually contain the agreement as he understood it at the time of accepting them. In other words, this is not an action for rescission or to recover damages, but for the reformation of certain instruments. It must be remembered, also, that the equitable remedy of reformation will only be granted upon clear and convincing evidence. *Hapeman v. McNeal*, 48 Wash. 527, 93 Pac. 1076; *Carlson v. Druse*, 79 Wash. 542, 140 Pac. 570; *Moore v. Parker*, 83 Wash. 399, 145 Pac. 440. The reason for the rule is well stated in *Potter v. Potter*, 27 Ohio St. 84, as follows:

"This principle rests upon the soundest reason and upon undisputed authority, and if not adhered to by the courts, or, when plainly disregarded, is not enforced by reviewing courts, the security and safety reposed in deliberately written instruments will be frittered away, and they will be left to all the uncertainty incident to the imperfect and 'slippery memory' of witnesses."

It. is the appellant's principal contention that he was unable to read or write English, and that advantage was taken of him because of his illiteracy and ignorance. But if we were to admit the appellant's illiteracy and inability to read and write, we cannot agree with the conclusion counsel draws therefrom; namely, that for this reason fraud was practiced upon him by the respondent. There is no evidence that the appellant ever informed the respondent, or any of the others connected with this transaction, that he could not read or write. On the contrary, his every action would, and did, lead them to believe he could read and write English. The appellant admits that, while in the real estate office, on various occasions, he would pick up a daily newspaper and hold it before him for a considerable time, to all appearances reading it. When the various papers in the transaction were being discussed, they were handed to him and he apparently read them over. At no time did he intimate to any one that he could not read, or was unable of himself to gather their contents. In view of his actions, from which it would naturally be inferred he could read and write, we fail to see how the appellant can now rely upon the claim· that the respondent took advantage of his illiteracy.

Nor does it follow, as is contended, that the appellant, being unable to read and write, was without any business ability whatever, and was, therefore, an easy subject for imposition. A man's inability to read or write the English language does not indicate his ignorance of business transactions. In searching the record, we fail to find any evidence which shows that the appellant is utterly ignorant of business affairs. True, he may be technically unlearned, but there is considerable undisputed testimony showing him to· have had some previous business experience of the nature here involved, and the record shows that he had the capacity to amass a considerable property. However, the law does not prohibit a person learned in the intricacies of the business world from dealing with one who is utterly ignorant of

business transactions. All that is required is fairness; that no unfair advantage be taken of one's ignorance or lack of business experience.

We are unable to see where the appellant has made out a case entitling him to reformation. He knew well the meaning of a deficiency judgment, and was advised at all times that respondent would not become personally liable upon the mortgage in any further sum than the $3,000. He knew, and was advised at all times by his attorney, what the result would be should he have to foreclose a mortgage upon the Yakima land which expressly disclaimed any personal liability. Knowing this, he first insisted that the mortgagors become personally liable to him in the sum of $5,000. This the respondent refused to do, but finally did agree to become personally liable for $3,000. The appellant also rejected this offer, and solely for the reason that he had sufficient business acumen to foresee that a loss might fall upon the holder of the mortgage should its foreclosure become necessary. His attorney read and fully explained the papers and their contents to him. He did, however, reconsider his rejection and the advice of his attorney, and before the final meeting broke up, accepted of his own volition the notes and mortgage. There is no claim that other offers were proposed during the short period between his last rejection and his subsequent acceptance, and no contention can be made that he might have become confused as to just what he was doing. In view of the record, we cannot reach any conclusion other than that the appellant knew what rights the instruments he accepted conferred upon him. Not only is the record clear upon this point, but it seems to us to give a reason for appellant's seemingly unbusinesslike bargain in accepting respondent's offer after he had personally ascertained the value of the Yakima property, and after he knew the effect of the provisions of the notes and mortgage; the instruments he accepted could be turned in as payment on the California land he had concluded to purchase.

A further contention is made that the trial court erred in denying his motion for a new trial upon the ground of newly discovered evidence. Affidavits were filed in support of the motion, which go to show that the appellant could not read or write the English language and it is averred that, upon a retrial, this fact could be established. But the trial judge made no finding upon the question whether appellant could read or write, and in denying the motion for new trial stated that his conclusion to the effect that the appellant accepted the instruments knowing what they contained and their effect was based upon other considerations than that of the appellant's ability to read and write; holding in effect that this circumstance was not a controlling element in the case. With this conclusion of the trial court, we agree. To our minds, the weight of the evidence is clearly to the effect that the appellant understood the contract and its purport, and this is all that is necessary, even though the record established beyond a doubt that he could neither read nor write the English language. Newly discovered evidence which in no event could affect the result is not ground for a new trial.

One further claim of error is presented, namely, the refusal of the trial court to permit a personal recovery for the attorney's fees provided for in the note and mortgage. But without following the argument of counsel, we are clear that these were but parts of the general obligations of the notes, governed by the terms of the mortgage limiting the amount of the deficiency judgment. In other words, the provisions for attorney's fees simply enlarge the amount of the obligation in case of a foreclosure of the mortgage. They were not contracts to be independently performed.

The judgment is affirmed.

MORRIS, C. J., MOUNT, CHADWICK, and ELLIS, JJ., concur.